**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

MARY L. CLAUSSEN,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

No. C05-4083-MWB

**REPORT AND RECOMMENDATION**

_____

*TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . **2**

    A.   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    B.   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        1.   *Introductory facts and Claussen's hearing testimony* . . . . . . . **3**
        2.   *Claussen's medical history* . . . . . . . . . . . . . . . . . . . . . . . **6**
        3.   *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . **10**
        4.   *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

III.  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **12**

    A.   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **12**
    B.   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . **15**

IV.  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

V.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# I. INTRODUCTION

The plaintiff Mary L. Claussen ("Claussen") appeals a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Claussen claims the ALJ erred in discounting the opinion of her treating physician, and in finding her subjective complaints not to be credible. (*See* Doc. No. 6)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On December 9, 2002, Claussen filed an application for DI benefits, alleging a disability onset date of December 15, 1998. (R. 64-66) Claussen alleged she was disabled due to lower back and leg pain, which she claimed prevented her from standing, walking, sitting, riding, or sleeping for any length of time. (R. 181) She stated she stopped working because she could no longer stand the pain. (*Id.*) Her application and request for reconsideration both were denied (R. 54-58, 60-62), based on a determination that Claussen was able to perform her past relevant work as a parts expediter. (R. 56, 60)

Claussen requested a hearing (*see* R. 33-34, 63), and a hearing was held before ALJ George Gaffaney on November 8, 2004, in Clear Lake, Iowa. (R. 191-226) Claussen was represented at the hearing by non-attorney Lee Sturgeon. Claussen testified at the hearing, and Vocational Expert ("VE") Warren Haagenson also testified. At the beginning of the hearing, Claussen amended her alleged disability onset date to October 29, 2002, based on a prior denial of benefits. (R. 194)

On February 24, 2005, the ALJ ruled Claussen was not entitled to benefits. (R.17-25) Claussen appealed the ALJ's ruling, and on May 26, 2005, the Appeals Council denied Claussen's request for review (R. 8-10), making the ALJ's decision the final decision of the Commissioner.

Claussen filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Claussen's claim. Claussen filed a brief supporting her claim on September 9, 2005. (Doc. No. 6) The Commissioner filed a responsive brief on October 27, 2005 (Doc. No. 7).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Claussen's claim for benefits.

### B. Factual Background

#### 1. Introductory facts and Claussen's hearing testimony

At the time of the hearing, Claussen was fifty-six years old. She is a high school graduate, and has had no other education since high school. She is right-handed, about 5'3" tall, and weighs 134 pounds. (R. 195)

Claussen worked as a cook at Uncle Lee's Pizza & Subs from 1985 to 1987. (*See* R. 69, 90-91, 196-97) From 1987 to 1996, she worked as a parts expediter at C.B. Electronics, Inc., a local telephone company. (*See* R. 70-73, 90, 92, 196-97) She did data entry on a computer, carried mail bags, and took supplies to technicians. She spent about five hours of the eight-hour day on her feet. The job required her to lift about ten pounds frequently, and up to fifty or sixty pounds on occasion. (R. 92, 197-99)

Claussen was unemployed during 1997. (R. 73, 90) In 1998, she worked as a line worker at a couple of different meat packing plants, where she packed meat into boxes. (R. 74, 90, 94, 196) The jobs required her to lift up to ten pounds frequently. She was on her feet most of the eight-hour work day. (R. 94) Claussen stated both of the meat

3

packing jobs ended because she was unable to do the work due to low back pain. (R. 200) She has not worked since 1998. (R. 74, 90)

Claussen stated that since October 29, 2002 – her amended alleged disability onset date – she would not have been able to return to any of her past jobs because of the required standing and lifting. (R. 200-01)

Claussen's primary treating physician since October 29, 2002, has been John Sinnott, D.O. According to Claussen, Dr. Sinnott has advised her not to lift over ten pounds, and to rest whenever she can and "[j]ust take it easy." (R. 201-02) She stated a specialist at the University of Iowa Medical Center also told her not to lift over ten pounds, not to allow her grandchildren to sit in her lap, and not to do a lot of bending. (R. 202)

Claussen stated that although her disability claim previously was focused on her lower back, a new problem had emerged in her upper back since August 2004. She had an MRI which, according to her, showed a spur going into her spinal cord between her tenth and eleventh vertebrae. (R. 204) She stated she has pain in her lower back from about waist level down to her tailbone, and in her upper back from just below her shoulder blades up into her shoulders. She stated she is never free of pain, even when she takes all of her medications and is very careful. The best her pain ever gets is about a seven on a ten-point scale, which occurs twenty to thirty minutes after she takes her pain medication. She takes as many as six Hydrocodone pills a day for pain. She stated the medication works for about three-and-a-half hours before her pain begins to return. (R. 204-06) According to Claussen, the Hydrocodone makes her "good and drowsy," to the extent that she would not want to drive while she is taking the medication. (R. 206-07)

Claussen described her average daily activities as follows. She stated she wakes up in the morning, and it may take her forty-five minutes to an hour to get out of bed because she is in so much pain. Once she gets up, she makes coffee, brushes her teeth, and goes

4

out to the garage for a cigarette. She smokes about a pack of cigarettes a day, and she goes out to the garage because they do not smoke in their house. She then will do whatever household chores need to be done, such as making the bed, cooking, or doing a load of laundry. She stated she cooks one meal a day, and her husband helps with household chores after he gets off work at night. (R. 207-08) Claussen stated her husband does all of the vacuuming and yard work. (R. 214)

During the day, if her pain gets bad, Claussen might take a hot bath or lay on the floor with her feet up. She will alternate pacing, sitting, lying down, and walking, because if she does any of those activities for very long, her back will hurt. She estimated she can remain in one position for fifteen to twenty minutes before she will have to change positions. According to Claussen, sitting for more than fifteen minutes causes pain in both her upper and lower back. She can walk or stand for about twenty minutes, but then she will have pain in both hips and in her lower back. (R. 209-10) Claussen estimated she could work for no more than two hours a day, even if the job allowed her to change positions often from sitting to standing. (R. 211-12)

Claussen stated she drives once a week, "[d]irectly to the grocery store," which is thirteen miles from her home. (R. 212) She usually goes alone to do her grocery shopping, and it takes her about twenty minutes to shop. She is able to carry her groceries from the car to the house by putting the items into smaller bags, which she estimated weigh three to four pounds each. She makes several trips to carry in the light-weight bags. She parks her car in the garage, and the distance she has to carry the bags is very short. After she finishes her shopping and carries in the groceries, she will be in pain. On grocery shopping day, she is not able to do any other household chores, such as washing dishes or doing laundry. (R. 212-13)

In addition to her Friday grocery shopping, she also drives two blocks every day to get her mail. Other than these two activities and going to doctors' appointments, she

5

usually does not leave the house. She does not go visit friends or family. She stated she and her husband used to go out for social functions but she is no longer able to go. Her only recreational activity is reading. The heaviest thing she lifts is a five-pound sack of potatoes or a carton of milk. She has tried to lift heavier items but it caused pain in her back and she could not straighten back up. She has difficulty picking up items off the floor because she cannot kneel or squat, and she sometimes uses her toes to pick things up. (R. 214-17) Claussen stated she has some limitation in using her left arm because it "doesn't have the feelings in it like it should" due to "that thing up there at my shoulders." (R. 217) The problem with her left arm started in August 2004. However, she stated that even before that, she had problems reaching overhead, or bending down to get something out of a lower cupboard. (R. 217-18)

Claussen stated she has difficulty concentrating and comprehending what she reads due to her medications and her pain. She stated the pain interferes with her concentration more than the drowsiness from her medication. (R. 219)

### 2. *Claussen's medical history*

The record indicates Claussen began complaining of hip and low back pain after falling on the ice in January 1995. (*See* R. 178) Over the next five years, she was treated with pain killers and muscle relaxants, injections of pain-killing drugs, chiropractic treatments, and physical therapy. X-rays and MRI tests showed a herniated disc at L5-S1, disc bulges at L3-L4 and L4-L5, annular fibrosis at T12, and "a lot of degenerative changes in the lumbar spine." (R. 176-78) None of the treatment modalities seemed to provide Claussen with any significant relief. X-rays of her lumbar spine in March 2001, showed no significant change since films of March 15, 1997. An MRI showed progressive disc bulging at L5-S1. (R. 124-27, 174)

6

Claussen's back problems continued, and in June 2002, her doctor discussed possible surgery with Claussen for her ongoing back problems. (R. 173) A bone scan performed on June 14, 2002, was normal, but x-rays in July 2002, indicated Claussen's back condition remained unchanged. (R. 138-39, 173)

In July 2002, Claussen's doctor, John Sinnott, D.O., referred her to Steven Meyer, M.D., an orthopedic specialist, for an evaluation. Dr. Meyer ordered another MRI, which continued to show no change since March 1, 2001. There continued to be a stable, small, left lateral protrusion at L4-5; a very small left lateral protrusion at L3-4; and a very small right paracentral protrusion at L5-S1. (R. 142) Dr. Meyer interpreted the MRI as showing "a small amount of foraminal encroachment on the left at L4-5," but not enough to cause the severe pain Claussen continued to report. (R. 145) He recommended EMG/NCV studies of both lower extremities to rule out other causes of Claussen's radicular leg pain. (*Id.*) EMG and nerve conduction studies were performed on August 16, 2002, and both were normal, showing "no evidence of myopathy, peripheral neuropathy, or radiculopathy into the lower extremities on either side." (R. 144) Dr. Meyer noted that despite Claussen's "complaints of severe pain, we have been unable to find any significant objective pathology." (R. 143) He suggested Claussen might benefit from treatment at a pain clinic, and on August 28, 2002, Dr. Sinnott referred her to the pain clinic in Iowa City. (*Id.*, R. 173) However, it appears Claussen was not seen in Iowa City until June 18, 2003. (*See* R. 163-64)

On March 3, 2003, Claussen was examined by Rose Mary Mason, M.D. at the request of Disability Determination Services. (R. 147-52) Dr. Mason observed the following from her examination of Claussen:

> Her height was 62 inches. Weight 141 pounds. Her blood pressure was 120/70. She had some limitation of motion of her lumbar spine. She could only flex this to 80 degrees, extend to 15 degrees, laterally flex to 20 degrees and she had some popping of her back with movement. She was able to

7

> walk on her toes and heels. She had pain in her left leg on raising the leg and could raise the left leg 70 degrees but the right leg she could raise 90 degrees. She had slight limitation of the motion of her left hip. She could only flex the left hip 95 degrees but could flex the right hip 100 degrees. She could abduct the right hip 30 degrees and the left hip 25 degrees and there was some limitation[] of internal and external rotation of both hips. She had some numbness in her left leg but none in her right.

(R. 148-49) Dr. Mason diagnosed Claussen with "degenerative disc disease of the lumbar spine with left sided sciatic type pain . . . [and] nicotine addiction." (R. 149)

On April 16, 2003, Claude Koons, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 153-60) He opined Claussen would be able to lift ten pounds frequently and twenty pounds occasionally; stand, walk, or sit for up to six hours in an eight-hour workday; and push/pull without limitation. (R. 154) He found she could perform all types of postural activities occasionally. (R. 155) He recommended she avoid concentrated exposure to hazards "[s]econdary to alleged pain and narcotic meds used." (R. 157) Dr. Koons found Claussen's credibility to be somewhat eroded by the lack of objective medical evidence to support her claim of progressively severe low back pain with radiating leg pain. (R. 160) On August 26, 2003, Jeffrey L. Wheeler, M.D. reviewed the record and concurred in Dr. Koons's conclusions. (R. 160-62)

Claussen was evaluated at the University of Iowa Pain Medicine Clinic on June 18, 2003. She was diagnosed with sacroiliac arthropathy. Doctors prescribed Bextra, and directed Claussen to return in two months, at which time they planned to consider an injection. (R. 163-64)

Claussen did not see Dr. Sinnott for follow-up examinations between January 1, 2003, and September 30, 2003, but he continued to refill her anti-inflammatory and pain medications. (*See* R. 165, 172) On September 30, 2003, Claussen complained to

Dr. Sinnott that since beginning the Bextra, her right shoulder was improved, her back remained the same, but she had "poor nerves, poor balance," and was not feeling well. She continued to take Hydrocodone at bedtime. Dr. Sinnott directed Claussen to discontinue the Bextra for awhile to see if her balance and anxiety symptoms improved. (R. 172) At her next follow-up exam on October 13, 2003, she still was taking Hydrocodone occasionally at bedtime for pain. Dr. Sinnott recommended she stay off Bextra. He gave her samples of Arthrotec to try. On October 22, 2003, she reported some improvement in her symptoms with the Arthrotec, but stated it was bothering her stomach. She planned to try her husband's Nexium to see if that helped her stomach problems. The doctor directed her to continue taking one Hydrocodone pill at bedtime. He gave her a prescription for Arthrotec. He concurred in her plan to try Nexium, and also told her to take Pepcid as needed. (R. 171)

Although Claussen saw Dr. Sinnott regularly for medical problems, such as a cold, a skin abscess, and other problems (*see* R. 170-71), her next follow-up with regard to her back was several months later, on June 2, 2004. Claussen stated she was still taking Hydrocodone for pain relief. She had quit taking Arthrotec because she felt it was not helping her. At bedtime, she was taking one Hydrocodone and one Tylenol, and she took additional Tylenol during the day. She complained of anxiety and intermittent stress relating to the possible abuse of her grandson. The doctor directed Claussen to continue taking one Hydrocodone tablet at bedtime, and he prescribed Xanax for anxiety. (R. 170)

On October 25, 2004, Dr. Sinnott completed a Treating Medical Source Statement form regarding Claussen's diagnoses and treatment. (R. 185-90) He listed her diagnoses as low back and mid-back pain, aggravated by sitting, standing, walking, rotation, bending, or stooping. He noted Claussen had exhibited decreased flexion, posterior extension, and side bending and rotation, with tenderness and muscle spasm. Dr. Sinnott opined Claussen's experience of pain often was severe enough to interfere with her

attention and concentration. He noted that reported side effects from Claussen's medications include lethargy and tiredness, which would impose a significant limitation upon Claussen's ability to function. (R. 185-86)

Dr. Sinnott opined Claussen could sit for fifteen minutes, and then she would have to stand or walk about for fifteen minutes before returning to a seated position. He estimated she could sit for a total of two hours in an eight-hour workday. He further opined she could stand and walk about for no more than fifteen minutes before she would have to lie down for half an hour, and she could only stand or walk about for a total of two hours in an eight-hour work day. The doctor indicated Claussen would have to lie down or recline for a total of two hours in an eight-hour work day to relieve pain arising from her documented medical impairment. (R. 187-88) He stated Claussen could lift up to ten pounds occasionally and five pounds frequently; she should never stoop; she could perform reaching activities with both arms occasionally, handling activities with both hands frequently, and fingering with both hands frequently. (R. 189-90)

Claussen underwent an MRI study of her thoracic spine on October 28, 2004. The study showed an "[o]steophytic spur indenting the thecal sac and possibly the segmental nerve at T11 on the left." (R. 9) The MRI report was considered by the Appeals Council, but not by the ALJ. (*See* R. 8)

The record also contains evidence related to a severe attack of pancreatitis in July 2004, for which Claussen underwent a cholecystectomy on September 28, 2004. (*See* R. 168-69, 180-84)

### 3. *Vocational expert's testimony*

VE Warren Haagenson testified Claussen's past work as a parts expediter would be classified as "a light, semiskilled occupation." (R. 221) Her work as a mail clerk would be "described as a light, unskilled occupation," although Claussen performed the job as

"close to medium." (R. 221-22) Her job as a pizza cook "is a low level skilled occupation requiring medium physical demands." (R. 222)

The ALJ asked the VE the following hypothetical question:

> The first hypothetical, we'll limit to 10 pounds . . . frequently and 20 occasionally. . . . Six hours standing, six hours sitting in an eight-hour workday. Occasionally balance, stoop, crouch, kneel, crawl and climb. Only frequent [sic] exposure to hazards and able to do complex technical work or skilled. If we assume [Claussen] has this residual functional capacity, would [she] be able to perform any of their past relevant work, either as she did it or as it's typically performed in the national economy?

(R. 223) The VE stated the hypothetical individual would be able to perform all of Claussen's past jobs, as she had described them, and the parts expediter both as Claussen described it and as it normally is performed in the national economy. (R. 223-24)

If the ALJ changed the hypothetical to limit lifting to five pounds frequently and ten pounds occasionally, with all other limitations being the same, the VE stated the individual would be suited only for sedentary work. Because Claussen has no transferable skills to sedentary work, the individual would be unable to perform any work. (R. 224)

## 4. *The ALJ's decision*

The ALJ found Claussen was insured through December 31, 2002. He found Claussen last worked in 1998, and she has not engaged in substantial gainful activity since her alleged disability onset date of October 29, 2002. (R. 21, 24) The ALJ found Claussen "has impairments of sacroiliac arthropathy and degenerative disc disease of the lumbar spine," but he further concluded her impairments, though severe, do not satisfy the regulatory requirements for disability. (R. 21)

The ALJ "agree[d] with the determinations of the State Agency medical consultants that [Claussen] is capable of her past work." (R. 23) He found "very few objective

11

findings" in the record to support Claussen's complaints of persistent pain, and he therefore concluded Claussen's subjective complaints were not completely credible. (R. 23)

The ALJ assessed Claussen's residual functional capacity as follows: ability to lift twenty pounds occasionally and ten pounds frequently; stand and sit for up to six hours in an eight-hour workday; and occasionally balance, stoop, crouch, kneel, crawl, and climb; with a limitation on exposure to hazards in the workplace. He further found Claussen "is able to do complex, technical work." (*Id.*) Based on this assessment of Claussen's residual functional capacity, and the VE's testimony, the ALJ concluded Claussen can return to her past relevant work, and therefore, she is not disabled. (R. 23-24)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v.*

*Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the

physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th

14

Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir.

1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding

17

the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Claussen argues the ALJ erred in failing to give great weight to Dr. Sinnott's opinion, and the ALJ gave inadequate reasons for failing to accord Dr. Sinnott's opinion great weight. She further argues the ALJ erred in discounting her credibility. She claims a proper evaluation of the evidence supports the RFC found by Dr. Sinnott, and mandates a decision that she is, in fact, disabled. (*See* Doc. No. 6)

The Commissioner first notes Claussen must prove she was disabled between her amended alleged disability onset date of October 29, 2002, and the date her insured status expired on December 31, 2002. (*See* Doc. No. 7, p. 8; R. 21) The Commissioner argues the ALJ's treatment of Dr. Sinnott's opinion was appropriate because the doctor's records do not indicate he saw Claussen for her back problems during the relevant period.

The Commissioner is correct. The record contains no treatment history for Claussen's back problems for the period from October 29, 2002, to December 31, 2002 (the "relevant period"). Claussen must establish that she became disabled prior to the time her insured status expired. *See* 20 C.F.R. §§ 404.130, 404.131. "When an individual is no longer insured for Title II disability purposes, we will only consider an individual's medical condition as of the date she was last insured." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) (citing *Bastian v. Schweiker*, 712 F.2d 1278, 1280 (8th Cir. 1983)). The fact that Claussen's condition may have become disabling after her date last insured does not provide a sufficient basis for an award of benefits under Title II. *Cf. Dunlap v. Harris*, 649 F.2d 637, 639 (8th Cir. 1981) ("A nondisabling condition at age 22 which later develops into a disability is not sufficient as a basis for child's disability insurance benefits.") (citing *Reading v. Mathews*, 542 F.2d 993 (7th Cir. 1976)).

18

Claussen filed a prior application for benefits that was denied, and she failed to appeal the denial. As a result, the decision that she was not disabled for Title II purposes at any time through October 28, 2002, became binding. *See* 20 C.F.R. § 404.955. Therefore, she must prove she was disabled between October 29, 2002, and her date last insured of December 31, 2002. The record contains no medical evidence that Claussen's back condition was disabling during the relevant period.

This leaves only Claussen's testimony, taken nearly two years after the expiration of her insured status, that during the relevant period, she was unable to work. To determine whether Claussen's testimony was credible on this point, the ALJ looked to the objective medical records after the relevant period. It is reasonable to conclude that if the medical records indicated Claussen was disabled immediately after the relevant period ended, it would lend credence to her testimony that she was disabled during the relevant period. However, the record evidence does not suggest Claussen became totally unable to work until many months following the expiration of her insured status. When Claussen was examined by Dr. Mason at the request of DDS, the doctor's examination revealed that Claussen had some limited motion of her lumbar spine, legs, and hips, but there is nothing in Dr. Mason's report other than Claussen's subjective complaints to indicate Claussen suffered from disabling pain or limitations. (*See* R. 147-52) Claussen did not seek other medical treatment for back pain until October 2003, when she saw Dr. Sinnott for follow-up. At that time, she reported taking Hydrocodone occasionally at bedtime for pain. This is a far cry from the six Hydrocodone she reported taking daily by the time of the hearing in November 2004.

Claussen's situation is regrettable. The record suggests (although the court does not so find) that Claussen's condition may have degenerated to the point of disability following her date last insured for Title II disability purposes. For purposes of the present appeal, however, the court finds the record contains substantial evidence to support a decision that

Claussen failed to show she was disabled during the relevant period, and she therefore does not qualify for Title II benefits.

## V. CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 2nd day of March, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1] Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).